UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S. N. HAHN,<br><br>              Plaintiff,<br><br>      v.<br><br>KILOLO KIJAKAZI,<br><br>              Defendant. | Case No.  22-cv-05717-AMO<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND REMANDING CASE FOR FURTHER PROCEEDINGS**<br><br>Re: Dkt. Nos. 15, 18 |

Plaintiff S. N. Hahn[1] moves for summary judgment, seeking reversal of the Social Security Commissioner's denial of her application for disability insurance benefits.  The Commissioner opposes the motion and cross-moves for summary judgment affirming the denial.  Having considered the parties' papers, the administrative record, and the relevant legal authority, the Court GRANTS Hahn's motion for summary judgment, DENIES the Commissioner's cross-motion for summary judgment, and REMANDS this matter for further proceedings.

## I.    BACKGROUND

### A.    Hahn's Application for Social Security Disability Insurance Benefits

On July 7, 2020, Hahn filed a protective application[2] for disability insurance benefits, alleging a disability start date of January 15, 2019.  Administrative Record ("AR") at 228-231.  At

---

[1] The Court partially redacts Hahn's name to mitigate privacy concerns.  *See Heather L. v. Saul*, No. 19-CV-02483-SI, 2020 WL 3504468, at *1 n.1 (N.D. Cal. June 29, 2020) (citing Fed. R. Civ. P. 5.2(c)(2)(B)).

[2] The term "protective application" refers to "the first time [a claimant] contact[s] the Social Security Administration to file a claim for disability or retirement. . . .  This is important because [a] protective filing often affects the entitlement date for disability and retirement beneficiaries along with their dependents."  *Burnham v. Berryhill*, No. 17-CV-05476-JCS, 2019 WL 1332397, at *1 n.2 (N.D. Cal. Mar. 25, 2019) (internal quotations and citation omitted).

United States District Court<br>Northern District of California

United States District Court
Northern District of California

the request of the Social Security Administration ("SSA"), Hahn submitted six function reports: three that she completed, one from a friend named Stephen, one completed by Pooran, Hahn's mother, and one from a friend named Melissa.[3]  *Id.* at 299-310, 316-323, 331-341, 342-353, 390-400, 401-413.  Hahn also submitted, among other materials, two seizure questionnaires, and she visited two doctors for consultative examinations ordered by the SSA.  *Id.* at 311-315, 354-357, 444-509, 512-529, 582-594, 595-656, 657-733, 748-754, 779-783, 779-783.

1.    Function reports

**a.    Function reports by Hahn**[4]

In the function report she completed on January 14, 2020, Hahn indicated that she lives with her 11-year-old daughter in an apartment.  *Id.* at 303.  Hahn stated that she has a nerve disorder on her face and tongue and experiences "debilitating migra[i]nes and seizure episodes daily."  *Id.*  She also has PTSD, heavy anxiety, and panic attacks and suffers from Raynaud's disease,[5] rheumatoid arthritis, and an autoimmune disease.  *Id.*  She reported that "[i]t is extremely difficult for [her] to physically work and lift heavy objects, [and] clean dishes[.]"  *Id.*  Hahn wrote that she "feel[s] sick most days" and cannot "work or function like [*sic*] a normal job, or live like a regular person."  *Id.*  Her autoimmune disease makes her feel weak and "abnormally exhausted."  *Id.* at 304.  The seizure and nerve episodes "cause [her] not to function."  *Id.*

---

[3] A function report, whether from the claimant or from a third-party who knows the claimant, is a form the SSA uses to obtain information about the claimant's activities and abilities.  *See* Form SSA-3373-BK, Soc. Sec. Admin. Forms, available at https://www.ssa.gov/forms/ssa-3373-bk.pdf (last visited Mar. 25, 2024); s*ee also* Form SSA-3380-BK, Soc. Sec. Admin. Forms, available at https://www.ssa.gov/forms/ssa-3380.pdf (last visited Mar. 25, 2024).

[4] With respect to the three function reports Hahn completed, to avoid repetition, the Court focuses on the portions where Hahn provides details not included in other reports.

[5] For background purposes only, the Court notes that Raynaud's disease is "a vascular disorder that is marked by recurrent spasm of the capillaries and especially those of the fingers and toes upon exposure to cold, that is characterized by pallor, cyanosis, and redness in succession usually accompanied by pain, and that in severe cases progresses to local gangrene."  *See* Raynaud's disease, Merriam-Webster.com Medical Dictionary, Merriam-Webster, https://www.merriam-webster.com/medical/Raynaud%27s%20disease (last visited Mar. 25, 2024).  *See Battersby v. Lieh*, No. 20-CV-06561-EMC, 2023 WL 6390624, at *2 n.3 (N.D. Cal. Sept. 29, 2023) (taking judicial notice of dictionary definition of Raynaud's disease).

1    In describing her day-to-day activities, Hahn stated that she wakes up, makes breakfast,

2    and takes her daughter to school.  *Id.* at 304.  She goes home, takes a long walk, and usually naps

3    until 2:00 or 3:00 p.m.  *Id.*  She feeds her pets, gives them water, and walks them with the help of

4    some friends.  *Id.*  She does chores like preparing meals, laundry, and dishes, which hurt her hands

5    a lot.  *Id.* at 305.  She needs reminders or physical help to do these things.  *Id.*  She goes outside

6    daily in the morning, but sometimes she feels "too sick to go outside."  *Id.* at 306.  She shops for

7    food, groceries, pet foot, and clothes about once a week.  *Id.*  When she needs to go someplace,

8    she will drive, walk, use public transit, take a bike, or get a ride.  *Id.*  Hahn listed reading, walking

9    dogs, movies, and fishing as hobbies, but reported that she does not do these things often because

10   she is tired and sleeps a lot.  *Id.* at 307.  Hahn also listed watching movies at home with others as a

11   social activity, but she does not do it often.  *Id.*

12       In terms of how her illnesses affect her daily activities, Hahn stated that she has to dress

13   slowly and has a bad memory.  *Id.*  Sometimes she forgets to eat or forgets when food is cooking,

14   and she needs reminders, usually from a friend, to take her medications.  *Id.* at 304, 305.  She

15   indicated being able to care for her hair, shave, and use the toilet normally.  *Id.* at 304.  For

16   bathing, she stated that warm and hot water helps her a lot.  *Id.*

17       She indicated that her conditions generally affect lifting, reaching, memory, completing

18   tasks, concentration, and using her hands.  *Id.* at 308.  She can pay attention for a few minutes,

19   does "okay" following written instructions, and is "good" at following spoken instructions.  *Id.* at

20   308.  She gets along with authority figures "okay," is "not good" at handling stress, and does not

21   handle changes in routine well.  *Id.* at 309.

22       In response to whether she has noticed any unusual behavior or fears, she listed

23   "PTSD/anxiety."  *Id.*  In the section asking about current medications, Hahn listed one medication,

24   Naproxin, and indicated sleepiness as a side effect.  *Id.* at 310.

25       In the function report Hahn completed on July 21, 2020, Hahn added that she "cannot be in

26   an area where there are loud noises[] or people screaming."  *Id.* at 346.  She cannot use her "hands

27   to work because the knuckles are deteriorated."  *Id.*  Her autoimmune disease weakens her

28   respiratory system.  *Id.*  Her "white blood cells kill their own kind, which causes [her] to be

United States District Court
Northern District of California

1    internally weaker, and [she] sleeps a lot because of it." *Id.* She usually feels exhausted by 11:00

2    a.m. and has to nap for a few hours. *Id.* at 347. She "cannot feel [the] left full side of [her] face

3    due to [a] facial nerve disorder," and she has had seizures since the age of 3. *Id.* at 346. She

4    indicated that her "seizures often occur at night." *Id.*

5        Hahn stated that her illnesses affect her day-to-day life. *Id.* She cannot take baths, so she

6    has to shower. *Id.* She lets her hair air dry most of the time. *Id.* She does not shave often

7    because of her knuckles. *Id.* Sometimes, she "ha[s] episodes when [she] uses the toilet or

8    bathroom." *Id.* She cannot put her hands in cold water or temperatures. *Id.* She drives

9    sometimes, but most of the time, she does not drive because of her seizures. *Id.* at 349.

10       Hahn's conditions generally affect lifting, reaching, stair-climbing, memory, completing

11   tasks, and using her hands. *Id.* at 351. She "cannot lift heavy items due to [the] condition of [her]

12   hands." *Id.* She "cannot complete dishes or laundry because of [her] hands." *Id.* She is also

13   "short and cannot reach high places." *Id.* Hahn can pay attention for 30 minutes or less and is

14   "okay" at following written instructions. *Id.* She stated that she cannot follow spoken instructions

15   and that she needs "physical on map directions or on paper." *Id.* She stated that she "get[s] along

16   great" with authority figures, is "mediocre" at handling stress, and is "okay" at handling changes

17   in routine. *Id.* at 351-352.

18       In response to the question of whether she has noticed any unusual behaviors or fears, she

19   stated that "[f]ireworks is new" and that her "PTSD has worsened." *Id.* In the section asking her

20   to list current medications, Hahn listed "Nortriptyline." *Id.* at 353. She noted sleepiness and

21   "cannot function" as side effects. *Id.*

22       In the function report she completed on February 16, 2021, Hahn added that she suffers

23   from ovarian cysts that "pop" and "come and go." *Id.* at 406. When Hahn gets sick, she is "sick

24   for a very long time up to 4 weeks to 6 weeks." *Id.* Her migraines are "very debilitating, behind

25   eyes, cannot function normal[ly]." *Id.*

26       In describing how her conditions affect certain tasks, she reported that her hands often hurt

27   when dressing, that hot baths and showers help her, and she blow dries her hair. *Id.* at 407. She

28   stated that she uses the toilet fine. *Id.* With respect to driving, Hahn said she does not drive

because she has no license.  *Id.* at 409.

Hahn also reported that her illnesses affect lifting, reaching, memory, completing tasks, concentration, and using her hands, but she did not indicate any trouble climbing stairs.  *Id.* at 411. She can pay attention for 10-20 minutes and gets along "okay" with authority figures.  *Id.* at 411. In terms of handling stress, Hahn said she does not do "well at all."  *Id.* at 412.  She is "ok" handling changes in routine, but it "can be bad sometimes."  *Id.*

In response to the question of whether she has noticed any unusual behaviors or fears, she listed loud noises, "[h]allucinations/more PTSD, [and] trouble remembering things."  *Id.* at 412.

### b. *Function report from Stephen*

In the function report from one of Hahn's friends, dated January 20, 2020, Stephen indicated that he has known Hahn for two years.  *Id.* at 316.  They get together weekly and exercise.  *Id.*  Stephen stated that Hahn cannot lift heavy objects due to stress on her hands, has trouble reaching because her hands get sore, and bending puts stress on her lower back.  *Id.* at 316, 321.  Stephen also stated that Hahn has trouble with memory.  *Id.* at 321.

Stephen reported that day-to-day, Hahn is in "mom mode" as soon as she wakes up.  *Id.* at 317.  Hahn cooks, constantly cleans, and helps her daughter with her homework.  *Id.*  She also walks and feeds her pets and teaches them tricks.  *Id.*  Stephen stated that he walks the dogs sometimes when Hahn goes to work.  *Id.*  Stephen indicated that Hahn used to work more and was more socially active.  *Id.* at 317, 318.

Stephen noted that Hahn suffers from insomnia due to her conditions but noted no problems with Hahn handling personal care tasks.  *Id.*  Stephen also noted that Hahn needs reminders to take her medication, so she sets alarms.  *Id.* at 318.  Stephen stated that Hahn goes outside for about three hours each day.  *Id.* at 319.  When Hahn needs to go someplace, she'll walk or drive.  *Id.*  She shops twice a week, for about an hour, for food, cleaning supplies, clothes, and essentials.  *Id.*  She is able to do "[a]ll normal chores that do not require heavy lifting" and completes them in the "[a]verage allotted time."  *Id.* at 318.

Stephen indicated that Hahn does "very well" following written instructions, does "well" following spoken instructions, and "see[s] no problem" with Hahn's ability to get along well with

authority figures. *Id.* at 321-322. Stephen also indicated that Hahn handles stress quite well and "adapts quickly" to changes in routine. *Id.* at 322. Stephen stated that he did not notice Hahn having any unusual behavior or fears or that her medications caused any side effects. *Id.* at 322-323.

### c.      Function report from Pooran

In the function report Hahn's mother completed on July 21, 2020, Pooran indicated that she spends time with Hahn and her daughter three times a week. *Id.* at 334. Pooran stated that Hahn wakes up at 7:00 a.m. to get ready for the day, eats, walks the dogs, runs errands, and takes a nap. *Id.* at 335. She tries to make lunch and sometimes prepares dinner. *Id.* Pooran noted that Hahn gets tired quickly. *Id.* at 335. Pooran stated that it takes Hahn one to two hours to do dishes and laundry, and that Hahn sometimes needs help to get these chores done. *Id.* at 336. Hahn goes out daily to walk the dogs and weekly for about one to two hours to shop for groceries, clothes, and household items. *Id.* at 337. Pooran stated that Hahn does not drive because of her seizures. *Id.* Pooran noted that Hahn previously worked a full-time job and a second job "but not anymore." *Id.* at 335.

As for Hahn's medical conditions, Pooran indicated that Hahn suffers from seizures during the day and night that affect her sleep, and that Hahn needs to set reminders to take medication. *Id.* at 335-336. Pooran indicated that Hahn cannot use her hands because the knuckles are damaged and painful. *Id.* at 339. Hahn also has trouble with memory, lifting, and reaching. *Id.* As far as Hahn's personal care, Pooran reported that Hahn can dress herself, only takes showers, lets her hair air dry, does not shave often, can feed herself, and can use the toilet. *Id.* at 335.

Pooran stated that Hahn can pay attention for 30 minutes to one hour, does "okay" following written instructions but "not well" following spoken instructions. *Id.* at 339. Hahn does "well" getting along with authority figures, is "not good" at handling stress, and does "ok" handling changes in routine. *Id.* at 340. Pooran stated that Hahn "doesn't function in a real world good," noting "pain and anxiety" and a "stressful life." *Id.* Pooran indicated that Hahn takes "Notriptyline" for her conditions and the side effect is that Hahn does "not function good." *Id.* at 341.

United States District Court
Northern District of California

#### d.        *Function report from Melissa*

In the function report from another one of Hahn's friends, completed on February 16, 2021, Melissa indicated that she has known Hahn for four and a half years. *Id.* at 393.  Melissa sees Hahn a few times a week. *Id.*  Hahn usually takes the dog for a walk and eats breakfast or lunch. *Id.*  She cares for her daughter and her pets. *Id.*  Melissa stated that no one helps Hahn care for her daughter or her pets. *Id.*  Melissa indicated that Hahn prepares meals daily, for about 30 minutes to an hour, and that she does not cook or prepare meals as often as she used to. *Id.* at 395. Hahn also cleans and does the laundry, and it takes her about an hour to three hours to complete these chores. *Id.*  Melissa stated that Hahn needs help cleaning the dishes and folding laundry. *Id.* Melissa indicated that Hahn goes outside every day but not as much as she used to. *Id.* at 396, 397.  When she needs to go somewhere, Hahn walks or rides in a car but she cannot drive because she does not have a license. *Id.* at 396.  Hahn shops for groceries and pet food and that takes her about an hour to three hours. *Id.*

Melissa noted that Hahn suffers from seizures, PTSD, migraines, an auto-immune disease, a facial nerve disorder, ovarian cysts, and arthritis in her knuckles. *Id.* at 393.  Melissa also noted that Hahn gets seizures at night. *Id.* at 394.  Melissa indicated that Hahn has no problems with personal care but needs alarms or reminders from family to take her medications. *Id.*  Melissa listed two medications that Hahn takes: "Amlodipine Besylate" and "Nortriplyline." *Id.* at 400. Melissa noted that Hahn experiences drowsiness as a side effect from each medication. *Id.* Melissa also indicated that Hahn has a service dog from seven years ago that Hahn needs when she has seizures or PTSD attacks. *Id.* at 399.

Melissa stated that Hahn's conditions affect lifting, squatting, bending, standing, reaching, memory, completing tasks, concentration, understanding, and the use of her hands. *Id.* at 398. Melissa also stated that she "d[id] not know" how Hahn's conditions affect those abilities. *Id.*

Melissa reported that Hahn can pay attention for 15 minutes, does "okay" following written and spoken instructions, and does "well" getting along with authority figures. *Id.* at 399. Hahn does not do well handling stress and is "okay" handling changes in routine. *Id.*  Melissa noted that Hahn has a fear of loud noises, and large crowds in a room are overwhelming for her.

*Id.*

### 2.   Seizure questionnaires

In a seizure questionnaire completed on January 20, 2020, Hahn indicated that she has suffered from seizures since 1988. *Id.* at 313.  Her seizures occur once every year or two, and her last seizure was in 2014. *Id.*  At the time of the questionnaire, Hahn was not taking any prescription medication for her seizures. *Id.* at 313.  She stated that she limits her driving due to her seizures and only drives to take her child to school and to get groceries. *Id.* at 314.  Hahn stated that it takes three weeks for her to resume normal activities after a seizure. *Id.* at 313.

In a second seizure questionnaire completed in August 2020, Hahn stated that her seizures started in 1987 and that they occur daily. *Id.* at 355.  She did not indicate the date of her last episode. *Id.*  Hahn stated that she was not taking her seizure medications as prescribed because she is severely allergic to the medications and that they cause her seizures. *Id.*  She instead takes marijuana for her seizures. *Id.*  Hahn reported that after a seizure, it takes four hours to three weeks for her to resume normal activities. *Id.*

### 3.   Consultative examinations

#### *a.   Psychological consultative examination*

On August 25, 2020, Hahn participated in a video consultation with psychologist D. Thigpen, Psy.D. *Id.* at 749.  Dr. Thigpen described Hahn as "polite and courteous" and "detailed and comprehensive." *Id.*  Dr. Thigpen indicated that Hahn "reported symptoms of anhedonia, social isolation, poor motivation, trouble concentrating, difficulty focusing, memory trouble, frequent crying, and feelings of worthlessness and hopelessness and irritability and insomnia." *Id.*  Dr. Thigpen diagnosed Hahn with "Depressive Disorder due to another medical condition with depressive features." *Id.* at 752.

In her functional assessment of Hahn, Dr. Thigpen concluded that Hahn's ability to perform simple and repetitive tasks appeared unimpaired. *Id.*  Her ability to perform detailed and complex tasks appeared mildly impaired. *Id.*  Hahn's ability to accept instructions from supervisors and her ability to interact with coworkers and the public appeared "moderately impaired given her tendency and preference to isolate." *Id.*  Hahn's ability to perform work

activities on a consistent basis without special or additional instruction appeared mildly impaired. *Id.* at 753. Her ability to maintain regular attendance and complete a normal workday/workweek without interruptions from a psychiatric condition appeared "moderately impaired given [Hahn's] tendency and preference to isolate, poor sleep hygiene and low mood/motivation." *Id.* Hahn's ability to deal with the usual stress encountered in the workplace also appeared "moderately impaired due to memory problem[s,] decreased stress tolerance, lack of patience and increased irritability[,] and poor self-esteem and feeling[s] of worthlessness." *Id.*

#### b.    *Physical consultative examination*

On November 17, 2020, Hahn visited Rose Lewis, M.D., for a physical consultative examination. *Id.* at 780. Dr. Lewis noted seizures, Raynaud's disease, and migraines as Hahn's chief complaints. *Id.* Dr. Lewis diagnosed Hahn with Raynaud's disease, migraines, "[s]eizures, per patient history[,]" gastroesophageal reflux disease, and "[d]oubt rheumatoid arthritis or scleroderma." *Id.* at 782.

In her functional assessment of Hahn, Dr. Lewis concluded that Hahn can stand, walk, and sit without limitations. *Id.* Hahn can lift and carry, pushing and pulling up to 50 pounds occasionally and 25 pounds frequently. *Id.* Hahn can climb steps, stairs, ladders, scaffolds and ropes, balance, stoop, kneel, crouch, and crawl without limitations. *Id.* Hahn can reach over head and forward without limitations, handle, finger, and feel without limitations, and hear and speak without limitations. *Id.* Hahn has no limitations working at unprotected heights, working around heavy machinery, or working around dust, fumes, gasses, or excessive noise. *Id.* at 782-783. Hahn has limitations working around extreme temperatures because "cold precipitates the Raynaud's sensation in her hands." *Id.* at 783.

### B.    The Denial of Hahn's Application

On November 25, 2020, the SSA initially denied Hahn's application for disability insurance benefits. *Id.* at 161-165. On January 14, 2021, Hahn requested reconsideration of the denial. *Id.* at 169. On March 25, 2021, the SSA again denied Hahn's application on reconsideration. *Id.* at 170-176.

//

United States District Court
Northern District of California

United States District Court
Northern District of California

### C.   The Administrative Hearing

On April 1, 2021, Hahn requested an administrative hearing. *Id.* at 177. Administrative Law Judge ("ALJ") Amy Rosenberg held the requested hearing via Zoom on August 18, 2021. *Id.* at 31-79. The ALJ heard testimony from Hahn, who was represented by counsel, and Heather Benton, a vocational expert. *Id.* at 37-76.

#### 1.   Hahn's testimony

Hahn testified that she worked as a barista at a Safeway Starbucks until November 2019. *Id.* at 41. She previously worked at a bakery for several years, where she made coffee and sandwiches, cleaned and restocked shelves, and opened and closed the store. *Id.* During her last year of employment at the bakery, Hahn started decorating cakes. *Id.* at 42-45. In addition to her work at Starbucks and the bakery, Hahn worked as a server at a restaurant. *Id.* at 45. She also worked as a cashier at a CVS, where her duties included restocking shelves. *Id.* at 46-47. Hahn started receiving unemployment benefits around the end of 2020 or beginning of 2021. *Id.* at 50.

When the ALJ asked what caused Hahn to file the application for disability insurance benefits, Hahn said that she has ovarian cysts that last for years. *Id.* at 52. When the cysts burst, she gets very sick. *Id.* On one occasion, while Hahn was working at a Safeway, she grabbed a garage bin to throw up in, and she had to go to the emergency room. *Id.* Hahn could not finish her shift, and the manager wrote her up for it. *Id.* Hahn was hospitalized for five to seven days. *Id.* She ended up getting fired. *Id.* at 54.

Hahn also testified that she suffers from other physical impairments including Raynaud's disease (a condition that affects her hands, knuckles, feet, and toes), a seizure disorder,[6] a facial nerve disorder, PTSD from physical abuse she suffered as a child, an autoimmune disease that affects her intestines, and migraines. *Id.* at 53-57. She gets really bad anxiety when she's in a room full of people. *Id.* at 53. Screaming or loud noises trigger her PTSD. *Id.* at 53, 59. She cannot sleep at night, so she takes Atarax and Melatonin. *Id.* Because of her Raynaud's disease, Hahn struggles in cold weather, which causes her hands and feet to go numb. *Id.* at 54. Her hands

---

[6] Hahn testified that her license was confiscated due to her seizure disorder, and that she does not "drive at all anywhere." *Id.* at 39-40.

United States District Court
Northern District of California

1    also cause Hahn difficulty when washing dishes, mopping, lifting things, or brushing or blow

2    drying her hair.  *Id.* at 44, 53, 61.  When Hahn gets a migraine, usually once or twice a month, she

3    has to sleep from one to three hours.  *Id.* at 57.  She takes prescription medications for her

4    conditions.  *Id.* at 57-58.

5                    2.        The vocational expert's testimony

6                    a.        ***Examination by the ALJ***

7            After Hahn testified, the ALJ heard from Heather Benton, a vocational expert.  *Id.* at 65-

8    78.  The ALJ asked Benton to classify Hahn's prior work.  *Id.* at 66.  Benton classified Hahn's

9    work as a bakery fast-food worker as light,[7] unskilled, SVP of 2,[8] and light as performed.  *Id.*

10   When combined with the additional responsibilities of icing and decorating cakes, the job was

11   considered "composite,"[9] though still classified as light, semi-skilled, SVP of 3, and light as

12   performed.  *Id.*  Benton classified Hahn's work as a waitress as light, semi-skilled, SVP of 3, and

13   light as performed.  *Id.* at 66-67.  She classified Hahn's work as a cashier as light, unskilled, SVP

14   of 2, and Hahn's work as "laborer stores" as medium,[10] unskilled, SVP of 2.  This composite job

15   was light as performed.  *Id.* at 67.  Hahn's work as a coffee maker was medium, unskilled, SVP of

16   _____

17   [7] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
     objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this
18   category when it requires a good deal of walking or standing, or when it involves sitting most of
     the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).
19
     [8] "SVP, or specific vocational preparation, reflects how long it generally takes to learn a given job.
20   Unskilled work corresponds to an SVP of 1-2, semi-skilled work corresponds to an SVP of 3-4,
     and skilled work corresponds to an SVP of 5-9."  *Jim Pan Su v. Berryhill*, No. 16-cv-06486-EDL,
21   2017 WL 8294290, at *4 n.2 (N.D. Cal. Dec. 4, 2017) (internal citations omitted).

22   [9] "A composite job has significant elements of two or more occupations, and as such, ha[s] no
23   counterpart in the [Dictionary of Occupational Titles].  Composite jobs are evaluated according to
     the particular facts of each individual case."  *Kevin M. v. Comm'r of Soc. Sec.*, No. C19-993-MLP,
24   2020 WL 747850, at *2 (W.D. Wash. Feb. 14, 2020) (internal quotations and citation omitted).
     "The Dictionary of Occupational Titles . . . is the best source for how a job is generally
25   performed."  *Id.* (internal quotations and citation omitted).

26   [10] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or
27   carrying of objects weighing up to 25 pounds.  If someone can do medium work[,] . . . he or she
     can also do sedentary and light work."  20 C.F.R. § 404.1567(c).
28

1  2, and light as performed.  *Id.*

2      Once Benton provided classifications for Hahn's prior work history, the ALJ asked Benton

3  a hypothetical.  *Id.* at 67-68.  The ALJ asked Benton to consider a hypothetical individual with the

4  claimant's age, education, and past work experience and assume the following:

- The individual is limited to working at the medium level of exertion and to no more than frequent handling and fingering.

- The individual should not climb ladders, ropes, or scaffolds, work at unprotected heights or outdoors in cold weather, or be exposed non-weather-related extreme cold.

- The individual can sustain the concentration necessary to carry out simple tasks on a sustained basis.

- The individual could tolerate frequent, but not constant, interactions with supervisors, coworkers, and the public.

- The individual should not work in public settings such as grocery stores, movie theaters, shopping malls, sports venues, or similar types of public places in which crowds of people might be present.

- The individual could tolerate a moderate noise intensity level, such as that encountered in a business office environment or experienced in light traffic.

- The individual could adapt to occasional changes in a routine work setting.

*Id.* at 67-68.  The ALJ asked Benton if this hypothetical individual would be able to perform any

of Hahn's past work as actually or generally performed.  *Id.* at 68.  Benton testified that this

individual could not perform such work.  *Id.*  The ALJ also asked Benton if the hypothetical

individual could perform any other work.  *Id.*  Benton testified that there would about 350,000

housekeeping positions with those limitations nationally, about 500,000 cleaner positions, and

85,000 stock clerk positions.  *Id.*

        The ALJ then asked Benton to re-consider the hypothetical, this time modified by a

reduction in exertional level (from medium to light) but keeping all other non-exertional

limitations.  *Id.* at 69.  The ALJ asked Benton whether there were any jobs this hypothetical

individual could perform.  *Id.*  Benton testified that there would be 200,000 stock clerk positions at

the light and unskilled level, 150,000 office clerk positions, and 50,000 shipping clerk positions.

1    *Id.*

2        The ALJ also asked Benton about the typical employer's tolerance for absenteeism.  *Id.* at

3    69-70.  Benton responded, "I think a maximum of two days per month on a consistent basis."  *Id.*

4    at 70.

5                    2.        Cross-Examination by Hahn

6        On cross-examination, Benton testified that the numbers corresponding to the positions she

7    provided were for full-time positions.  *Id.* at 71.  She also testified that if the hypothetical

8    individual showed up for work everyday but could only work for six hours, that would not be

9    commensurate with an employer's expectations for a full-time employee.  *Id.*  Hahn then asked

10   Benton if there was a vocational definition of "moderate" in the context of mental limitations like

11   hers.  *Id.* at 73.

12       After a colloquy during which the ALJ expressed doubt that Benton could even answer

13   that kind of question and stated that "moderate could vary mildly," Hahn proceeded to ask Benton

14   a series of questions.  *Id.* at 73-74.  Hahn asked whether a claimant with the following limitations

15   could perform the jobs Benton had previously identified:

16       •   The individual's ability to accept instructions from supervisors is moderate.

17       •   The individual has a tendency to isolate.

18
         •   The individual's ability to interact with coworkers is moderate, given the tendency
19           to isolate.

20       •   The individual's ability to maintain attendance and complete a normal workday or
21           workweek is moderate due to poor mood and motivation.

22       •   The individual's ability to deal with the usual stresses encountered in the workplace
             was moderate because of lack of patience, irritability, poor self-esteem, and
23           feelings of worthlessness.

24   *Id.* at 74.  Benton explained that of these limitations, the one having the most impact would be the

25   inability to complete the workweek.  *Id.* at 75.  She reiterated her prior testimony that employers

26   would tolerate about two absences per month and added that it was "[h]ard to say" whether the

27   consultative psychologist intended "moderate" to mean "more than two days per month."  *Id.*

28       Hahn then asked whether it would be commensurate with employer expectations if an

United States District Court
Northern District of California

1    employee showed up every day but could not work the full day.  *Id.* at 76.  Benton said

2    "[t]ypically, not."  *Id.*  She added that leaving two hours early would be treated as an absence.  *Id.*

3    She also testified that if this occurred on a more chronic basis, there was a greater chance of

4    discipline and eventual dismissal.  *Id.*

5        **C.      The ALJ's Decision**

6        On August 31, 2021, the ALJ issued a written decision.  AR at 10-25.  Applying the five-

7    step sequential evaluation process set by the SSA's regulations, the ALJ concluded that Hahn was

8    not disabled from January 15, 2019, through the date of the decision.  *Id.* at 11.

9        At step one, the ALJ considered whether Hahn engaged in substantial gainful activity.[11]

10   *Id.* at 12.  While the ALJ found that Hahn engaged in substantial gainful activity from January

11   2019 through November 2019, the ALJ also found that Hahn had not been engaged in substantial

12   gainful activity for a 12-month period after she stopped working in November 2019.  *Id.* at 12-13.

13   The ALJ specified that her remaining findings therefore applied "from November 2019 to

14   present."  *Id.* at 13.

15       The ALJ thus proceeded to step two and considered whether any of Hahn's claimed

16   impairments were severe.[12]  *Id.*  The ALJ found that the following impairments were severe and

17   significantly limited Hahn's ability to perform basic work activities: "Raynaud's disease/systemic

18   sclerosis; migraine headaches and/or tension headaches; seizure disorder; somatoform disorder;

19   anxiety disorder; post-traumatic stress disorder; [and] insomnia."  *Id.*  The ALJ noted that Hahn

20   suffered from gastroesophageal reflux disease with mild symptoms but did not consider this

21   condition a severe impairment.  *Id.*

22

23   [11] "Substantial gainful activity is work activity that is both substantial and gainful."  20 C.F.R.
     § 404.1572.  "Substantial work activity is work activity that involves doing significant physical or
24   mental activities."  *Id.* § 404.1572(a).  "Gainful work activity is work activity" performed "for pay
     or profit."  *Id.* § 404.1572(b).  If a claimant is engaged in a substantial gainful activity, the
25   claimant is not disabled.  *See id.* § 404.1520(a)(4)(i).

26
     [12] A "severe impairment" is one that "significantly limits [the claimant's] physical or mental
27   ability to do basic work activities."  *Id.* § 404.1520(c).  If the claimant does not suffer from a
     severe impairment, the claimant is not disabled.  *See id.*
28

United States District Court
Northern District of California

At step three, the ALJ considered whether Hahn's impairments met or equaled the severity

"of one of the listed impairments in 20 C.F.R. Part 404, Part P, Appendix 1."[13]  *Id.* (citing 20

C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  The ALJ found that none of Hahn's impairments

met or equaled a listed impairment.  *Id.* at 13-14.

Before moving to step four, the ALJ determined Hahn's residual functional capacity.[14]

The ALJ found that Hahn:

> has the residual functional capacity to perform medium work as
> defined in 20 CFR [§] 404.1567(c) except that the claimant should
> not climb ladders, ropes, or scaffolds and should not work at
> unprotected heights.  She can frequently handle and finger.  She
> should not perform work outdoors in cold weather and should not be
> exposed to non-weather-related extreme cold.  She can sustain the
> concentration necessary to carry out simple tasks on a sustained
> basis.  She can tolerate frequent, but not constant, interactions with
> supervisors, coworkers, and the public, but she should not work in
> public settings such as grocery stores, movie theaters, shopping
> malls, sports venues, or similar types of places in which crowds of
> people might be present.  She can tolerate a moderate noise intensity
> level as defined in the Selected Characteristics of Occupations,[15]
> equivalent to a business office or light traffic.  She can adapt to
> occasional changes in the routine work setting.

*Id.* at 14-15.

In reaching this assessment as to Hahn's residual functional capacity, the ALJ found that

---

[13] "The listings describe impairments that are considered to be severe enough to prevent an individual from doing any gainful activity."  *Kitchen v. Kijakazi*, 82 F.4th 732, 741 (9th Cir. 2023) (internal quotations and citation omitted).

[14] A claimant's residual functional capacity "is the most [they] can do despite [their] limitations." 20 C.F.R. § 416.945(a)(1).  It "is used at step four to determine if a claimant can do past relevant work and at step five to determine if a claimant can adjust to other work."  *Ferguson v. O'Malley*, --- F.4th ---, ---, 2024 WL 1103364, at *2 (9th Mar. 14, 2024) (citing 20 C.F.R. § 416.945(a)).

[15] "The Secretary may rely on the general job categories of the *Dictionary of Occupational Titles,* with its supplementary *Selected Characteristics*, as presumptively applicable to a claimant's prior work."  *Villa v. Heckler*, 797 F.2d 794, 798 (9th Cir. 1986) (internal citations omitted; italics in original).  "Appendix D to the Selected Characteristics of Occupations ('SCO') defines various levels of noise to which workers are exposed on the job, ranging from level one to level five."  *Glenn v. Comm'r of Soc. Sec. Admin.*, No. CV-21-01840-PHX-MTL, 2022 WL 15517829, at *3 (D. Ariz. Oct. 27, 2022).  An environment with moderate noise, "such as a business office where type-writers are used; department store; grocery store; light traffic; [or] fast food restaurant at off-hours" ranks at level three.  *Id.* (internal quotations and citations omitted; modifications in original).

1   Hahn's "medically determinable impairments could reasonably be expected to cause the alleged

2   symptoms." *Id.* at 15.  However, the ALJ found Hahn's statements about the "intensity,

3   persistence and limiting effects of those symptoms" to be "not entirely consistent with the medical

4   evidence and other evidence in the record." *Id.* at 15, 18.

5         At step four, the ALJ determined that Hahn could not perform any of her past relevant

6   work. *Id.* at 22-23.  The ALJ noted that Hahn previously worked as a barista/coffee maker, a

7   bakery/fast-food worker, a server/waitress, and two composite jobs, one combining the

8   responsibilities of both a fast-food worker and cake icer, the other consisting of responsibilities of

9   cashier and "laborer stores." *Id.* at 23.

10        At step five, the ALJ considered whether Hahn could perform any other work. *Id.*  The

11   ALJ noted that Hahn was 33 years old as of the alleged disability onset date. *Id.* at 23.  As such,

12   Hahn was a younger individual within the meaning of 20 C.F.R. § 404.1563(c). *Id.*  The ALJ also

13   noted that Hahn has at least a high school education. *Id.*  The ALJ did not consider transferability

14   of job skills material to a determination of disability because Hahn was "'not disabled'"

15   irrespective of whether she had transferable job skills. *Id.*  Taking into account Hahn's age,

16   education, work experience, and residual functional capacity, the ALJ determined that Hahn could

17   perform several jobs "that exist in significant numbers in the national economy." *Id.* at 23-24.  In

18   reaching this conclusion, the ALJ relied on the vocational expert's testimony that an individual of

19   Hahn's age, education, work experience, and residual functional capacity "would be able to

20   perform the requirements of representative unskilled occupations at the medium exertional level

21   such as: housekeeper, DOT #323.687-010 (approximately 350,000 jobs nationally); cleaner, DOT

22   #381.687-018 (approximately 500,000 jobs nationally); and stock clerk, DOT #222.387-030

23   (approximately 85,000 jobs nationally)." *Id.* at 24.  The ALJ therefore found Hahn "'not

24   disabled.'" *Id.*

25        **D.      Hahn's Request for Review by the Appeals Council**

26        On October 21, 2021, Hahn requested review of the ALJ's decision.  AR at 224-227.  The

27   Appeals Council denied Hahn's request on August 16, 2022. *Id.* at 1-6.  Once the Appeals

28   Council denied review, the ALJ's decision became the final decision of the Commissioner. *Id.* at

United States District Court
Northern District of California

224-226.

### E.   This Action

On October 4, 2022, Hahn commenced this action against the Commissioner, seeking judicial review of the denial of her application for Social Security disability benefits pursuant to 42 U.S.C. § 405(g). ECF 1. On January 11, 2023, the Commissioner filed an answer to the complaint. ECF 10. On March 10, 2023, Hahn filed her motion for summary judgment to reverse the Commissioner's final decision denying benefits, seeking a remand of this action for an immediate award of benefits, or alternatively, for further proceedings. ECF 15. On April 7, 2023, the Commissioner filed a combined opposition and cross-motion seeking summary judgment affirming the denial of Hahn's application. ECF 18. On April 21, 2023, Hahn filed her combined opposition and reply. ECF 19.

## II.   LEGAL STANDARD

### A.   Standard of Review

The Social Security Act authorizes judicial review of final decisions made by the Commissioner. 42 U.S.C. § 405(g). "Th[e] court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence in the record that could lead to a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citations omitted).

In deciding whether substantial evidence supports an ALJ's findings, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (internal citation and quotation marks omitted). If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from

the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and quotation marks omitted).

A district court may enter a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing.  42 U.S.C. § 405(g).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded" for further proceedings.  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).  If, however, "the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits."  *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).

**B.**  **The Five-Step Disability Inquiry**

Subject to other provisions not relevant here, a claimant is "disabled" under the Social Security Act if two requirements are met.  *See* 42 U.S.C. § 1382c(a)(3).  First, the claimant must be "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Id.* § 1382c(a)(3)(A).  Second, the impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  *Id.* § 1382c(a)(3)(B).

The SSA's regulations set forth a five-step sequential evaluation process for determining whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  The relevant inquiry at each step is as follows:

> 1.  Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).
>
> 2.  Is the claimant's impairment severe?  If so, proceed to step three. If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.  Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1?  If so, then the claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.  Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.  Is the claimant able to do any other work?  If so, then the claimant is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).  The claimant has the burden of proof at steps one through four and the Commissioner has the burden of proof at step five. *Tackett*, 180 F.3d at 1098.  Nonetheless, every step of the inquiry, the ALJ has an affirmative duty to assist the claimant in developing the record.  *Id.* at 1098 n.3.  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Id.*

In between the third and fourth steps, the ALJ must determine the claimant's residual functional capacity.  20 C.F.R. § 404.1520(a)(4).  After determining the claimant's residual functional capacity, the ALJ proceeds to steps four and five of the disability inquiry.  *See Ferguson*, 2024 WL 1103364, at *2.

## III.    DISCUSSION

Hahn seeks summary judgment in her favor on three grounds.  ECF 15-1 at 8.  First, Hahn argues that the ALJ erred by failing to address critical aspects of the medical evidence, specifically Dr. Thigpen's opinion that Hahn's ability to complete a normal workday or workweek was moderately impaired.  *Id.* at 18.  Second, Hahn contends that the ALJ improperly rejected her testimony, including testimony about the severity of her migraine headaches.  *Id.* at 19-20.  Third, Hahn argues that the ALJ erred by failing to provide any reasons for rejecting the lay witness testimony in the record.  *Id.* at 21-26.  Hahn argues that these errors are grounds for reversal of the ALJ's denial of benefits and entitle her to a remand for an immediate award of benefits, or alternatively, for further administrative proceedings.  *Id.*

The Commissioner cross-moves for summary judgment, arguing that the ALJ properly assessed the medical evidence, adequately considered Hahn's testimony, and correctly rejected lay

United States District Court
Northern District of California

1   witness testimony.  ECF 18 at 9-18.  The Commissioner additionally argues that if the Court finds

2   reversible error, remand for further proceedings, rather than for an immediate award of benefits, is

3   the proper remedy.  *Id.* at 18-20.

4          The Court addresses each disputed issue in turn.

5          **A.       Did the ALJ err in considering the medical evidence?**

6          "Although the [2017] regulations eliminate the 'physician hierarchy,' deference to specific

7   medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how

8   [they] considered the medical opinions' and 'how persuasive [they] find all of the medical

9   opinions.'"  *V.W. v. Comm'r of Soc. Sec.*, No. 18-CV-07297-JCS, 2020 WL 1505716, at *14 (N.D.

10  Cal. Mar. 30, 2020) (internal quotations and citation omitted).[16]  "Even under the new regulations,

11  an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent

12  without providing an explanation supported by substantial evidence."  *Woods v. Kijakazi*, 32 F.4th

13  785, 792 (9th Cir. 2022).  Rather, "[t]he agency must 'articulate . . . how persuasive' it finds 'all of

14  the medical opinions' from each doctor or other source, and 'explain how [it] considered the

15  supportability and consistency factors' in reaching these findings."  *Id.* (quoting 20 C.F.R.

16  §§ 404.1520c(b), (b)(2)).  "Supportability means the extent to which a medical source supports the

17  medical opinion by explaining the relevant . . . objective medical evidence."  *Woods*, 32 F.4th at

18  791-92 (internal quotations and citation omitted); *see also* 20 C.F.R. § 404.1520c(c)(1) ("The

19  more relevant the objective medical evidence and supporting explanations presented by a medical

20  source are to support his or her medical opinion(s) . . . , the more persuasive the medical

21  opinions . . . will be").  "Consistency means the extent to which a medical opinion is 'consistent . .

22  . with the evidence from other medical sources and nonmedical sources in the claim.'"  *Woods*, 32

23  F.4th at 792; *see also* 20 C.F.R. §§ 404.1520c(c)(2) ("The more consistent a medical opinion(s) . .

24

25  _____

26  [16] "For claims filed before March 27, 2017, [t]he medical opinion of a claimant's treating
    physician [wa]s given controlling weight so long as it [wa]s well-supported by medically
    acceptable clinical and laboratory diagnostic techniques and [wa]s not inconsistent with the other
27  substantial evidence in [the claimant's] case record."  *V.W.*, 2020 WL 1505716, at *13 (internal
    quotations and citations omitted).

28

*United States District Court*
*Northern District of California*

. is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be").  When rejecting a medical opinion as unsupported or inconsistent, the ALJ is required to "provid[e] an explanation supported by substantial evidence."  *Woods*, 32 F.4th at 792.

Hahn contends that the ALJ erred by failing to consider the portion of Dr. Thigpen's opinion identifying the "the moderate limitation" affecting Hahn's ability to "maintain[] attendance and complet[e] a normal workday or work week."[17]  ECF 15-1 at 17.  Hahn argues that when accounting for this limitation, in combination with the testimony about the severity of her migraines,[18] she would be absent from work more than twice per month.  *Id.* at 18.  According to Hahn, this would make for a disabling combination of impairments based on the testimony from the vocational expert, who testified that a competitive employer would not tolerate more than two absences per month.  *Id.*

In response, the Commissioner argues that the ALJ appropriately translated the moderate limitations Dr. Thigpen identified into concrete functional limitations, i.e., simple tasks with limited social contact and occasional changes in a routine work setting.  ECF 18 at 9.

The Court agrees that the ALJ erred in assessing the portion of Dr. Thigpen's opinion that identified a moderate limitation in Hahn's ability to complete a normal workday or workweek.  The ALJ made no mention of that limitation in her assessment of Hahn's residual functional capacity.  *See* AR at 9-25.  The ALJ, however, found Dr. Thigpen's opinion to be persuasive and generally consistent with the medical evidence and the record overall.  *Id.* at 21.  The ALJ also noted that "[a] finding of 'moderate' limitations . . . does not describe with any specificity a claimant's functional abilities or limitations[,]" yet proceeded to translate most of the limitations described in Dr. Thigpen's opinion into concrete work restrictions, with the exception of the

---

[17] Hahn otherwise concedes that "the ALJ translated most of the limitations Dr. Thigpen assessed into concrete limitations suitable for the inclusion in the [residual functional capacity] finding." ECF 19 at 2-3.

[18] The Court addresses whether the ALJ properly discounted Hahn's testimony about the severity of her migraines in the next section.

United States District Court
Northern District of California

moderate limitation in Hahn's ability to complete a normal workday or workweek. *See id.* at 21. Failing to address this specific limitation without comment is error. *See Woods*, 32 F.4th at 792.

Moreover, given the vocational expert's testimony that the typical competitive employer would not tolerate more than two absences per month, the failure to address the moderate limitation Dr. Thigpen identified was not harmless. "An error is harmless only if it is inconsequential to the ultimate nondisability determination." *Lambert v. Saul*, 980 F.3d 1266, 1278 (9th Cir. 2020). Here, however, the definition of "moderate" is consequential. Depending on the definition of the term, the limitation Dr. Thigpen identified could potentially be disabling in light of the vocational expert's testimony about the level of acceptable absenteeism.

The cases the Commissioner cites in opposition do not compel a different conclusion. The two circuit decisions the Commissioner relies on do not implicate the potential absenteeism left unaddressed by the ALJ here. In *Shaibi v. Berryhill*, 883 F.3d 1102, 1107 (9th Cir. 2017), as amended (Feb. 28, 2018), the ALJ properly translated physician testimony about the claimant's conditions into concrete limitations, including a restriction to "simple routine tasks in a non-public setting, with occasional interaction with coworkers." In that case, the medical evidence in the record did not identify a limitation in the claimant's ability to complete the workweek. *See id.* at 1105. So too in *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008). There, the ALJ properly translated the claimant's "pace and mental limitations, into the only concrete restrictions available to him," i.e., the "recommended restriction to 'simple tasks.'" *Id.*

The district court decisions on which the Commissioner relies are more apposite but nonetheless unpersuasive. For example, in *Messerli v. Berryhill*, No. 1:16-cv-00800-SKO, 2017 WL 3782986, at *2 (E.D. Cal. Aug. 31, 2017), the medical evidence indicated that the claimant's ability to complete a normal weekday and workweek was moderately impaired. A vocational expert testified that there would be no jobs available for an individual who was off task 15 to 20 percent of the day, absent two days per month, or unable to perform her work three days of the week due to headaches. *Id.* at *5. The court affirmed the ALJ's finding of no disability based in

1    part on a reason not specifically identified by the ALJ.[19]  *Id.* at *7.  In *Rodriguez v. Colvin*, No.

2    1:13-cv-01716-SKO, 2015 WL 1237302, at *5 (E.D. Cal. Mar. 17, 2015), the claimant had a

3    moderate impairment in the ability to complete a normal workday and workweek, but the medical

4    opinion specifying the limitation also noted that the claimant was "able to perform work where

5    interpersonal contact [wa]s routine but superficial."[20]  *Id.* at *4.

6         These authorities do not entitle the Commissioner to prevail insofar as Hahn challenges the

7    ALJ's assessment of Dr. Thigpen's opinion.  The Court, therefore, grants summary judgment in

8    Hahn's favor on this issue, and denies the Commissioner's cross-motion so that, on remand, the

9    ALJ can develop the record on the definition of moderate and consider the definition in the

10   disability determination.

11        **B.      Did the ALJ err in assessing Hahn's testimony?**

12        "An ALJ engages in a two-step analysis to determine whether a claimant's testimony

13   regarding subjective pain or symptoms is credible."  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th

14   Cir. 2014).  At the first step of the analysis, "the ALJ must determine whether the claimant has

15   presented objective medical evidence of an underlying impairment 'which could reasonably be

16   expected to produce the pain or other symptoms alleged.'"  *Lingenfelter v. Astrue*, 504 F.3d 1028,

17   1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir.1991) (en banc)).

18   The claimant is not required to show "that her impairment could reasonably be expected to cause

19   the severity of the symptom she has alleged; she need only show that it could reasonably have

20   caused some degree of the symptom."  *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).  The

21   claimant is also not required to provide "objective medical evidence of the pain or fatigue itself, or

22   the severity thereof."  *Id.* (citation omitted).

23

24

25   _____

26   [19] The Court reads recent Ninth Circuit authority as precluding that approach.  *See Ferguson*, 2024
     WL 1103364, at *7 (holding that the district court erred by affirming the ALJ's determination for
     a reason that the ALJ did not assert).

27

28   [20] In any event, these decisions and the additional two the Commissioner cites are unpublished,
     out-of-district decisions that are not binding on this Court.

United States District Court
Northern District of California

If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). "This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." *See Garrison*, 759 F.3d at 1015 (internal quotations and citation omitted). "The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (citations omitted). The ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen*, 80 F.3d at 1284.

Hahn argues that the ALJ failed to properly assess her testimony for two reasons. First, Hahn contends that "the ALJ's sole reason for discounting Hahn's testimony was that . . . the objective evidence was not consistent with the limitations Hahn described," which is not specific, clear, and convincing. ECF 19 at 4. Second, Hahn argues that "the ALJ did not provide a legally adequate rationale for discounting Hahn's testimony regarding her migraines and the 1 to 2 absences per month they would still cause even after some improvement with medication." ECF 19 at 4.

In response, the Commissioner does not point to any specific, clear, and convincing reasons contained in the ALJ's decision.[21] Instead, the Commissioner simply recounts the record evidence that supports the ALJ's ultimate conclusion. ECF 18 at 11-13.

---

[21] The Commissioner disputes whether the specific, clear, and convincing standard applies, but nonetheless acknowledges that it is the standard adopted by the Ninth Circuit. *See* ECF 18 at 11 n.4.

As a preliminary matter, while Hahn seems to mount a generalized challenge to the ALJ's assessment of her testimony without regard to the issues raised in this appeal, the Court will only consider Hahn's arguments to the extent they relate to Hahn's migraine symptom testimony.  That is the only specific testimony Hahn points to in this appeal.  *See* ECF 19 at 4 ("The ALJ did not provide a legally adequate rationale for discounting Hahn's testimony regarding her migraines and the 1 to 2 absences per month they would still cause even after some improvement with medication."); *see also* ECF 15-1 at 18, 20.  With this clarification,[22] the Court agrees with Hahn that merely stating that testimony is undermined by the objective evidence is not a specific, clear, and convincing reason to discount the testimony about the severity of her migraines.  *See Lambert*, 980 F.3d at 1277 ("The ALJ noted generically that the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the objective medical and other evidence for the reasons explained in this decision.  But this boilerplate statement by way of introductory remark, which is routinely include[d] in ALJ decisions denying benefits, did not identify what parts of the claimant's testimony were not credible and why.") (internal quotations omitted; modifications in original).

To the extent the ALJ noted that Hahn "reported improvement of her headaches with medication treatment" and that Hahn's headaches resolved with Meclizine, effective [sic] (Exhibits 13F/1; 18F)," the ALJ did not specify the corresponding effective date or explain why relief from medication is inconsistent with Hahn's migraine testimony.[23]  *See Ferguson*, 2024 WL

---

[22] This construction seems appropriate in light of the parties' briefing, in which neither side addresses, for example, the portion of the ALJ's decision where she notes that Hahn's responses in function reports and seizure questionnaires contradicted each other.  *See* AR at 14, 16.  Because this Court's role is not "to fill in the ALJ's reasoning," the Court will not speculate about why the ALJ noted inconsistencies between the function reports and seizure questionnaires without any further comment.  *See Lambert*, 980 F.3d at 1278.

[23] As noted above, the Commissioner does not point to any specific, clear, and convincing reasons sufficient to justify the ALJ's rejection of Hahn's testimony.  *See generally* ECF 18.  The Court nonetheless addresses this portion of the ALJ's decision to the extent it could be interpreted as a reason for discounting Hahn's testimony.  To the extent the ALJ relied on Hahn's daily activities to discount her testimony, the above analysis also applies.  *See Ferguson*, 2024 WL 1103364, at

United States District Court
Northern District of California

1103364, at *4 (ALJ did not provide specific, clear, and convincing reasons where the ALJ failed to explain why the medical evidence [wa]s *inconsistent* with the claimant's subjective symptom testimony.").

In failing to do so, the ALJ erred.  *See Lambert*, 980 F.3d at 1277 ("Our cases do not require ALJs to perform a line-by-line exegesis of the claimant's testimony, nor do they require ALJs to draft dissertations when denying benefits. . . .  But our precedents plainly required the ALJ to do more than was done here, which consisted of offering non-specific conclusions that [the claimant's] testimony was inconsistent with her medical treatment.") (citation omitted); *cf. Smart v. Kijakazi*, 53 F.4th 489, 499-500 (9th Cir. 2022) (ALJ's adverse credibility determination was supported by specific, clear, and convincing reasons, including "examples across a multi-year period contrasting [claimant's] subjective pain testimony with objective medical evidence[,]" inconsistencies between the claimant's self-reported activities and claims of constant "10/10" pain, and the claimant's generally conservative treatment plan).

Accordingly, the Court grants Hahn's motion for summary judgment on this ground and denies the Commissioner's cross-motion.[24]  Because "the credibility determination is exclusively the ALJ's to make," *see Lambert*, 980 F.3d at 1278, it is for the ALJ to reconsider Hahn's migraine symptom testimony in light of the specific, clear, and convincing standard discussed above, *see Ferguson*, 2024 WL 1103364, at *7 (remanding for further proceedings so that the ALJ could reconsider headache symptom testimony).

//

//

---

*7 (ALJ erred by not explaining how the claimant's testimony about daily activities was inconsistent with the severity and frequency of his headaches).

[24] To the extent Hahn challenges the ALJ's failure to incorporate limitations related to her migraine symptoms in the residual functional capacity assessment, *see* ECF 15-1 at 18, the ALJ shall revisit that assessment consistent with the re-evaluation of Hahn's testimony about the severity of her migraines.  *See Ferguson*, 2024 WL 1103364, at *2 ("A claimant's subjective symptoms, if credited, are relevant to the determination of a claimant's residual function capacity.").

United States District Court
Northern District of California

United States District Court
Northern District of California

**C.      Did the ALJ err in evaluating lay witness testimony?**

A lay witness's testimony about a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence.  *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).  An ALJ may discount such evidence only by providing "reasons germane to each witness."  *Id.*; *see also Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 404.1502(a).  An ALJ need not "discuss every witness's testimony on a[n] individualized, witness-by-witness basis.  Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness."  *Molina*, 674 F.3d at 1114 (citation omitted).

Hahn argues that the ALJ erred by giving "no rationale for failing to credit the limitations" described in the third-party function reports from Hahn's mother and friends.  ECF 15-1 at 21-24; ECF 19 at 4-7.  The Commissioner does not dispute the ALJ failed to articulate reasons for discounting the testimony of these lay witnesses.  ECF 18 at 14-18.  Instead, the Commissioner argues that changes made to Social Security regulations in 2017 abrogate the Ninth Circuit's "germane reasons" standard discussed above.[25]  *Id.* at 17.  The Commissioner also argues that even if the Court finds error in the ALJ's failure to provide reasons for rejecting lay witness testimony, it is harmless because the evidence is duplicative of Hahn's testimony, and as such, "the ALJ's rejection of the claimant's subjective statements carries over to the lay source's statement."  *Id.*

The Ninth Circuit has not addressed whether the 2017 updates to the Social Security regulations have the effect the Commissioner advocates for here.  *See, e.g.*, *Stephens v. Kijakazi*, No. 22-35998, 2023 WL 6937296, at *2 (9th Cir. Oct. 20, 2023) ("We have not yet addressed whether under the new regulations an ALJ is still required to provide germane reasons for discounting lay witnesses.").  It has, however, continued to apply the germane reasons standard.

---

[25] The Commissioner specifically points to 20 C.F.R. § 404.1520c(d), which now reads "[w]e are not required to articulate how we considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section."  20 C.F.R. § 404.1520c.  Paragraphs (a)-(c) concern medical opinions and findings.  *See id.* § 404.1520c(a)-(c).

*See, e.g.*, *MacArthur v. Kijakazi*, No. 23-35050, 2023 WL 8519119, at *2 (9th Cir. Dec. 8, 2023) ("An ALJ may discount lay witness opinion evidence by providing reasons germane to each witness for doing so.") (citing *Molina*, 674 F.3d at 1111) (internal quotations omitted); *Eichenberger v. Kijakazi*, No. 22-35937, 2023 WL 5928483, at *2 (9th Cir. Sept. 12, 2023) (the ALJ's clear and convincing reasons for rejecting the claimant's testimony sufficed as germane reasons for rejecting lay testimony); *Alexander v. Kijakazi*, No. 22-35737, 2023 WL 4490340, at *2 (9th Cir. July 12, 2023) (ALJ's findings that lay witness statements conflicted with the medical evidence and were inconsistent with the claimant's activities satisfied the "germane reasons" standard).

Accordingly, the Court rejects the Commissioner's argument that the updates to the 2017 Social Security regulations relieve an ALJ of the requirement to articulate reasons germane to each witness when rejecting lay witness testimony. In keeping with the recent Ninth Circuit authority cited above, this Court applies the germane reasons standard here, and finds that the ALJ erred by failing to provide those reasons as to the third-party function reports from Hahn's mother and friends.

The Court also rejects the Commissioner's harmless error argument. As discussed above, the ALJ did not articulate specific, clear and convincing reasons for rejecting Hahn's testimony in the first place. The Commissioner cannot now rely on those unstated reasons to justify the ALJ's failure to articulate the bases on which she rejected lay witness testimony. *See Reeve v. Kijakazi*, No. 22-36018, 2023 WL 7411537, at *2 (9th Cir. Nov. 9, 2023) ("[B]ecause ALJ Ross did not have specific, clear, and convincing reasons for rejecting [the claimant's] symptom testimony, he could not reject [the claimant's] wife's lay testimony by relying on those same reasons."); *cf. Stephens*, 2023 WL 6937296, at *2 (failure to provide reasons germane to each lay witness was harmless where lay witness testimony duplicated the claimant's testimony, which the ALJ had rejected for legally sufficient reasons).

Because the ALJ failed to give reasons germane to each witness when she rejected the third-party function reports of Hahn's mother and friends, the ALJ erred. The Court, therefore,

United States District Court
Northern District of California

1   grants Hahn's motion for summary judgment on this basis and denies the Commissioner's cross-

2   motion.

3       **D.       What type of remand is appropriate?**

4       The Social Security Act permits the district court to affirm, modify, or reverse the

5   Commissioner's decision "with or without remanding the cause for a rehearing."  42 U.S.C.

6   § 405(g); *see also Garrison*, 759 F.3d at 1019.  "[T]he proper course, except in rare circumstances,

7   is to remand to the agency for additional investigation or explanation."  *Benecke*, 379 F.3d at 595

8   (internal quotations and citations omitted).  However, under the credit-as-true rule, the Court may

9   order an immediate award of benefits if three conditions are met:  (1) the ALJ failed to provide

10  legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion,

11  (2) there are no outstanding issues that must be resolved before a disability determination can be

12  made and further administrative proceedings would serve no useful purpose, and (3) when

13  considering the record as a whole and crediting the improperly discounted testimony as true, there

14  is no doubt as to disability.  *See Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017).  However,

15  even if all three criteria are met, the decision to remand for an award of benefits or remand for

16  further proceedings is within the district court's discretion.  *Id.*

17      Remand for further proceedings is the proper remedy here.  While Hahn argues that the

18  record is fully developed, her own contentions in this appeal demonstrate otherwise.  First, Hahn

19  asserts that Dr. Thigpen's opinion "*could* preclude competitive employment *depending* on the

20  definition of moderate."  ECF 15-1 at 25 (emphasis added); *see also* ECF 19 at 7.  Second, Hahn

21  faults the ALJ for failing to properly credit her testimony about the severity of her migraines, and

22  relatedly, for failing to consider such testimony as part of the residual functional capacity analysis.

23  ECF 15-1 at 18, 25; ECF 19 at 8.  Third, Hahn asserts that the ALJ did not provide legally

24  adequate reasons for rejecting lay witness testimony.  ECF 15-1 at 25; ECF 19 at 8.

25      Even if these issues were resolved in Hahn's favor, it is not clear that the ALJ would be

26  required to find Hahn disabled.  For these reasons, remand for further proceedings, rather than an

27  award for immediate payment of benefits, is appropriate.  *See Leon*, 880 F.3d at 1047 (remanding

28  for further proceedings where the claimant's testimony about fatigue was not fully developed and

United States District Court
Northern District of California

29

1  there were serious doubts as to whether the claimant was in fact disabled); *see also Dominguez v.*

2  *Colvin*, 808 F.3d 403, 408-09 (9th Cir. 2015) (remand was appropriate so that the ALJ could

3  determine how alleged impairments affected the claimant's residual functional capacity and

4  resolve inconsistencies between physician's opinions and treatment notes); *Treichler v. Comm'r,*

5  *Soc. Sec. Admin.*, 775 F.3d 1090, 1105 (9th Cir. 2014) (remand was appropriate where the

6  inconsistencies between the claimant's testimony and the medical evidence in the record raised

7  crucial questions as to the extent of the claimant's impairments).

8  **IV.    CONCLUSION**

9        For the reasons set forth above, the Court GRANTS Hahn's motion for summary

10  judgment, DENIES the Commissioner's cross-motion, and REMANDS this case for further

11  proceedings.  The Clerk is directed to enter judgment consistent with this order and close the file

12  in this matter.

13        **IT IS SO ORDERED.**

14  Dated: March 25, 2024

15

16

17                                      **ARACELI MARTÍNEZ-OLGUÍN**
                                    **United States District Judge**

18

19

20

21

22

23

24

25

26

27

28